**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**CORNILEOUS SMITH**

**CIVIL ACTION**

**VERSUS**

**NO. 24-799-JWD-SDJ**

**STATE FARM MUTUAL**
**AUTOMOBILE INSURANCE**
**COMPANY, ET AL.**

**RULING AND ORDER**

This matter comes before the Court on Plaintiff's *Motion for Partial Summary Judgment on the Issue of Fault* ("Partial *MSJ*") filed by Plaintiff Cornileous Smith ("Plaintiff" or "Smith"). (Doc. 19.) Defendants State Farm Automobile Insurance Company ("State Farm") and Wilbur Hughes ("Hughes") (collectively, "Defendants") oppose the motion. (Doc. 21.) Plaintiff filed a reply. (Doc. 22.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the Partial *MSJ* is granted.

**I.   RELEVANT BACKGROUND**

This case arises out of an April 7, 2023, vehicle collision on Interstate 10 ("I-10") between Baton Rouge and Lafayette. (*Statement of Undisputed Facts* ("*SUF*"), Doc. 19-2 at 1, ¶ 1.)[1] Smith and Hughes were both traveling westbound, in the left lane. (*Id.* at 1–2, ¶¶ 4, 7.) Smith was driving a Dodge Ram 3500 and was pulling a Gooseneck 40' trailer (i.e., a flatbed trailer) with Monster ramps (i.e., fold-over loading ramps). (*Id.* at 1, ¶ 6; Doc. 19-6 at 3–4.) Hughes was driving a Winnebago Solis (i.e., a camper van), insured by State Farm. (Doc. 19-2 at 1, ¶ 3; Doc. 21-2 at

---

[1] Unless otherwise indicated (e.g., with a qualifying record citation), when the Court cites to the *SUF*, the cited material has been admitted by Defendants. *See* M.D. La. Civ. R. 56(f).

48–49.) Hughes's wife, Angela Hughes, was riding in the passenger seat of the Winnebago at the time of the collision. (Doc. 19-2 at 1, ¶ 4.)

Hughes had been following Smith for approximately 25 miles before the collision. (*Id.* at 2, ¶ 10.) His van was "positioned directly behind" Smith's truck "for a 'considerable amount of time,'" (*id.* at 2, ¶ 11 (quoting Doc. 19-4 at 6)), although Hughes left 10–20 car lengths in between his vehicle and Smith's, (Doc. 21-2 at 27). It had rained earlier that morning—and may still have been misting—so the roadway was wet. (Doc. 19-2 at 2, ¶ 12; Doc. 19-4 at 6.)

When traveling westbound on I-10 between Baton Rouge and Lafayette, drivers will encounter an overpass before the Atchafalaya Basin Bridge. (Doc. 19-2 at 2, ¶ 13; *see also* Doc. 19-6 at 5.) As Hughes was ascending this overpass, he could not see Smith's truck/trailer, which was already on the descent. (Doc. 19-2 at 2, ¶ 14.) When Hughes crested the overpass, he "regained sight" of Smith. (Doc. 21-2 at 27–28.) At this time, Hughes also observed that traffic, including Smith's truck/trailer, "had come to a stop up ahead." (Doc. 19-2 at 2, ¶¶ 15–16; *see also* Doc. 21-2 at 27–28.) Hughes "slammed" on his brakes, but his van "lost traction" and skidded into the rear of Smith's flatbed trailer. (Doc. 19-2 at 2, ¶¶ 17, 19–20; *see also* Doc. 21-2 at 26, 28–29.) Hughes "did not attempt to swerve to avoid the crash." (Doc. 19-2 at 3, ¶ 18.)

The taillights on Smith's truck/trailer were working. (*Id.* at 1, ¶ 8.) Angela Hughes testified that "she did not observe anything out of the ordinary with the way that Cornileous Smith was operating the truck/trailer before the crash." (*Id.* at 1, ¶ 9.) Likewise, Hughes testified that Smith did not "cause or contribute" to the collision. (Doc. 21-2 at 28.) After being rear-ended, Smith "did not strike the vehicle positioned in front of [his] on the roadway." (Doc. 19-2 at 3, ¶ 22.)

2

## II.  PARTIES' ARGUMENTS

### A.  Plaintiff's Partial *MSJ* (Doc. 19)

Plaintiff argues that there are no genuine issues of material fact "relating to the *duty* and *breach* elements of negligence." (Doc. 19-3 at 1.) Hughes's actions "were the sole cause of the rear-end collision on April 7, 2023," and Defendants cannot "rebut the presumption of negligence that the law imposes . . . under the circumstances." (*Id.*) Consequently, Plaintiff requests that this Court grant the Partial *MSJ* and "find[] that Wilbur Hughes is 100% at fault for causing the . . . rear-end collision." (*Id.*)

In support of the above, Plaintiff points to Hughes's own testimony, namely: (1) that it had been raining earlier in the morning but was not raining at/around the time of the collision, (2) that Hughes was driving directly behind Smith's truck/trailer, (3) that he left 10–20 car lengths in between his vehicle and Smith's, (4) that he was traveling at 40–50 miles per hour, (5) that he lost sight of Smith's truck/trailer as he was ascending the overpass, (6) that he regained sight of Smith's truck/trailer as he crested the overpass, (7) that Smith's truck/trailer was stopped, (8) that he slammed on his brakes, and (9) that he nevertheless rear-ended Smith's flatbed trailer. (*Id.* at 2–3 (citing Doc. 19-4 at 8–9).) Plaintiff emphasizes Hughes's acknowledgement that Smith did nothing "to cause or contribute to the crash." (*Id.* at 3 (quoting Doc. 19-4 at 9).) According to Plaintiff, Hughes's van "sustained approximately $39,000.00" in damage from the collision. (*Id.* at 4.)

Plaintiff notes that, when deciding whether a defendant was negligent, Louisiana courts undertake duty-risk analysis, which requires proof of a duty of care, breach of that duty of care, cause-in-fact, scope of liability, and damages. (*Id.* at 5–6 (citing La. Civ. Code art. 2315; *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008)).) According to Plaintiff, "the first two elements are undisputed." (*Id.* at 6.) Under Louisiana law, "[a] motorist's duty of care includes the

3

duty to keep his vehicle under control and maintain a proper lookout for hazards." (*Id.* (quoting *Bennett v. La. Farm Bureau Cas. Ins. Co.*, 43,216 (La. App. 2 Cir. 4/30/08), 983 So. 2d 966, 970).) Relatedly, Plaintiff argues, a motorist must "maintain a safe following distance and exercise reasonable care to avoid collisions." (*Id.* (citing *Boggs v. Voss*, 31,965 (La. App. 2 Cir. 6/16/99), 741 So. 2d 139, 141).) Rain does not affect a motorist's duty of care. (*Id.* (citing *Shephard ex rel. Shephard v. Scheeler*, 96-1690 (La. 10/21/97), 701 So. 2d 1308, 1318).)

"A following motorist in a rear-end collision is presumed to have breached his duty and is therefore presumed negligent." (*Id.* (citing *Boggs*, 741 So. 2d at 141).) Given the presumption, it is the defendant's burden "to show that he was not guilty of any dereliction, however slight." (*Id.* (quoting *Shephard*, 701 So. 2d at 1318).) In other words, Plaintiff argues, a defendant must "establish[] that he had his vehicle under control, closely observed the lead vehicle, and followed at a safe distance under the circumstances." (*Id.* at 6–7 (quoting *Bennett*, 983 So. 2d at 971).) According to Plaintiff, a defendant "is charged under the law with seeing" that which he should have seen. (*Id.* at 7 (citing *Fontenot v. Patterson Ins.*, 09-0669 (La. 10/20/09), 23 So. 3d 259, 269).)

Plaintiff contends that, given the undisputed evidence, Defendants cannot seriously deny that Hughes owed a duty of care, nor can they rebut the presumption that Hughes breached that duty. (*See id.* at 7–8.) Plaintiff suggests that Hughes conceded his duty to Smith and to other motorists. (*Id.* (citing Doc. 19-4 at 15–17).) Further, Hughes knew that the roadway was wet, knew that his van "t[ook] more time to come to a stop than smaller vehicles," knew that he could no longer see Smith's truck/trailer, and nevertheless "cho[se] not to reduce his speed while ascending the . . . overpass." (*Id.* at 10.) Plaintiff therefore argues that there is no genuine issue of material fact concerning whether Hughes breached his duty of care. (*Id.*)

4

Finally, Smith again underscores Hughes's acknowledgement that Smith did nothing wrong. (*Id.* at 8–9.) Hughes testified that Smith's taillights were illuminated, informing Hughes that Smith's truck/trailer was stopping or had stopped. (*Id.* (citing Doc. 19-4 at 11–12).) When asked directly whether Smith "cause[d] or contribute[d] to this crash," Hughes answered no. (*Id.* at 9 (quoting Doc. 19-4 at 9).) Likewise, Angela Hughes "did not observe anything out of the ordinary with the way that Cornileous Smith was operating the truck/trailer before the crash." (*Id.* at 9–10.) And even after the crash, Smith was able to avoid hitting another vehicle. (*Id.* at 8.) Thus, Smith says, he is indisputably "free from fault." (*Id.* at 10.)

## B. Defendants' *Opposition* (Doc. 21)

Defendants argue that "summary judgment is inappropriate" because there are genuine issues of material fact concerning liability. (Doc. 21 at 1.) Defendants do not dispute Plaintiff's version of events but emphasize that Hughes followed Smith "at a safe distance and at a safe speed." (*Id.* at 2 (citing, *inter alia*, Doc. 21-2 at 27).) They also note that Hughes "had no advanced warning that the interstate traffic on the other side of the overpass had come to a stop." (*Id.* at 2 (citing Doc. 21-2 at 26–28; Doc. 21-3 at 10–11).) Although Hughes reacted appropriately—that is, by "slam[ing] on his brakes"—the wet roadway and the decline prevented his van from stopping in time. (*Id.*) Defendants clarify that most of the damage to Hughes's van was caused *after* the collision (i.e., by "driving the vehicle home" with a broken radiator, thereby ruining the engine). (*See id.* at 3 (citing Doc. 21-2 at 34).) But regardless, Defendants contend, the cost of the damage to Hughes's van "is not material to the issue of liability." (*Id.*)

Defendants observe that Louisiana "employs a 'pure' comparative fault system," which "requires a determination of the allocation of fault." (*Id.* at 4 (citing *Landry v. Bellanger*, 02-1443 (La. 5/20/03), 851 So. 2d 943, 952).) According to Defendants, "[s]uch a determination is one of

fact and should [therefore] be made by the jury." (*Id.* (citing *Chaisson v. Avondale Indus., Inc.*, 05-1511 (La. App. 4 Cir. 12/20/06), 947 So. 2d 171, 193–94).) Defendants add that a "favored motorist can be found comparatively negligent if his substandard conduct contributed to the cause of the accident." (*Id.* (citing *Watson v. Hicks*, 15-0046 (La. App. 4 Cir. 5/27/15), 172 So. 3d 655, 665).) The trier of fact must "examin[e] the conduct of both motorists [involved in a collision] under all the facts and circumstances." (*Id.* at 4–5 (intending to quote *Watson*, 172 So. 3d at 664).)

Defendants also argue that breach of duty, cause-in-fact, and damages are factual issues. (*Id.* at 5 (citing *Snearl v. Mercer*, 99-1738 (La. App. 1 Cir. 2/16/01), 780 So. 2d 563, 574).) Defendants agree that "a following motorist in a rear-end collision . . . is presumed negligent," (*id.* at 6 (internal quotation marks omitted) (quoting *Mart v. Hill*, 505 So. 2d 1120, 1123 (La. 1987))), but they stress that this presumption is rebuttable and "does not preclude the consideration of comparative negligence," (*id.* (citing *Eastman v. State Farm Mut. Auto. Ins. Co.*, 23-01107 (La. 5/1/24), 384 So. 3d 865, 873–74)). Likewise, Defendants agree with Plaintiff that, in order to rebut the presumption of negligence, a following motorist must typically prove "that he had his vehicle under control, closely observed the preceding vehicle, and followed at a safe distance under the circumstances." (*Id.* at 6–7 (internal quotation marks omitted) (quoting *Eastman*, 384 So. 3d at 874).) But they contend that the presumption can also be rebutted "by establishing [that] the unpredictable driving of the preceding motorist created a sudden emergency that the following motorist could not have reasonably anticipated." (*Id.* at 7 (internal quotation marks omitted) (quoting *Eastman*, 384 So. 3d at 874).)

Defendants suggest that "a person confronted with a sudden emergency, who does not have sufficient time to weigh and consider the best means to avoid an impending danger, should not be held to the same standard of control, care, and caution as someone who has ample opportunity to

fully exercise judgment and reason." (*Id.* (quoting *James v. Landry*, 24-0976 (La. App. 1 Cir. 5/2/25), 417 So. 3d 666, 673).) Because "[a]pplication of the sudden emergency doctrine requires factual determinations," it is "rarely appropriate on a motion for summary judgment." (*Id.* at 7–8 (quoting *Manno v. Gutierrez*, 05-0476 (La. App. 1 Cir. 3/29/06), 934 So. 2d 112, 117–18).)

In a similar vein, Defendants invoke the "unavoidable or inevitable accident" doctrine, which "relieves a person of liability so long as [he] shows that he was in no way to blame" for the crash. (*Id.* at 8 (citing *Salva v. Safeco Ins. Co. of Am.*, 2003 WL 22038366, at *2 (E.D. La. Aug. 25, 2003)).) In other words, "if a motorist or other traveler has exercised ordinary care as required by the common law (or the highest degree of care as may be required), and has nevertheless been the occasion of inflicting injury on another, the accident is said to be inevitable, for which no liability attaches." (*Id.* (quoting *Seals v. Morris*, 410 So. 2d 715, 719 (La. 1981) (on rehearing)).)

Defendants reiterate that Hughes was "following at a safe distance, traveling well below the posted speed, and . . . closely observing Mr. Smith's preceding vehicle until [he] w[as] no longer able to see [it]." (*Id.*) By the time Hughes "crested the overpass . . . and regained sight of Mr. Smith," traffic had come to a standstill. (*Id.*) Defendants contend that Hughes "could not have reasonably anticipated that traffic on the blindside of this interstate overpass would come to a complete, or near complete, stop in the middle of nowhere." (*Id.*) Thus, a reasonable trier of fact could determine that there was a sudden emergency which reduced Hughes's liability. (*Id.* at 9.)

Finally, Defendants note that Hughes braked but, because of the wet roadway and the decline, could not stop in time. (*Id.* at 8–9.) Accordingly, Defendants argue, a reasonable trier of fact could conclude that the accident was unavoidable or inevitable. (*Id.* at 9.) They submit that the road conditions, the location (i.e., on the decline), and the position of the traffic (i.e., "the blindside of the interstate overpass") made for a "perfect storm." (*Id.*)

7

### C. Plaintiff's *Reply* (Doc. 22)

Plaintiff distills Defendants' *Opposition* into two arguments: (1) that a jury should allocate fault between the parties, and (2) that a reasonable trier of fact could apply the "sudden emergency" doctrine and/or the "unavoidable or inevitable accident" doctrine to this case. (Doc. 22 at 1.) According to Plaintiff, "[n]either argument is supported by the evidence." (*Id.*) First, Plaintiff observes that, although Defendants raise the issue of comparative fault, they "fail to set forth a single fact to support the contention that Cornileous Smith, or another person for that matter, caused or contributed to the crash." (*Id.* at 1–2.) On the contrary, Hughes himself testified that Smith was in no way at fault. (*Id.* at 2 (citing Doc. 19-4 at 9).) Likewise, Angela Hughes testified that "she did not observe anything out of the ordinary with the way that Cornileous Smith was operating the truck/trailer before the crash." (*Id.*)

Second, Plaintiff argues that, in order for the "sudden emergency" doctrine to apply, a defendant "must be confronted with an *unanticipated hazard*." (*Id.* (citing, *inter alia*, *Cane v. O'Brien*, 23-0718 (La. App. 1 Cir. 2/23/24), 384 So. 3d 1003, 1010).) Here, however, Hughes "was fully aware of all of the potential hazards that existed on the date of the crash." (*Id.* at 3 (citing Doc. 19-4 at 15–17).) Consequently, Plaintiff declares, Defendants cannot invoke the "sudden emergency" doctrine. (*Id.* at 4.)

But also, Plaintiff continues, the "sudden emergency" doctrine "cannot be invoked by one who has brought [an] emergency on himself by his own wrong or who has not used due care to avoid it." (*Id.* (quoting *Dick v. Phillips*, 218 So. 2d 299, 302 (La. 1969)).) The fact that Hughes "slammed" on his brakes indicates that he was "not paying attention, not traveling at a safe speed, not seeing what [he] should have seen, and/or not following at a safe distance under the circumstances." (*Id.*) Likewise, the fact that Smith "had completely descended the overpass and

w[as] positioned on the flat portion of the roadway" when the collision occurred suggests that

Hughes brought the emergency on himself. (*See id.* at 4–5 (citing Doc. 21-3 at 22).)

In support of this contention, Plaintiff cites *Daigle v. Scioneaux*, 15-0366, 2016 WL

687157, at *6–7 (La. App. 1 Cir. 2/17/16), in which the court held that the third motorist in a pile-

up could not "claim[] that the sudden emergency doctrine arose when the second vehicle [rear-

ended] the first" and, in doing so, came to an "abrupt stop." (*Id.* at 6.) Plaintiff emphasizes *Daigle*'s

conclusion that applying the "sudden emergency" doctrine to such cases

> would set a dangerous precedent for future litigation, as any following motorist who
> rear-ends a vehicle could argue that any and every vehicle that comes to a sudden
> stop constitutes an "unanticipated hazard" in order to invoke the sudden emergency
> doctrine and escape liability. Rear-end collisions are common occurrences on the
> roadways of this state, and an abruptly stopped vehicle is not an unanticipated
> occurrence by any means.

(*Id.* (cleaned up) (quoting *Daigle*, 2016 WL 687157, at *7).)

Plaintiff also draws parallels to *Ebarb v. Matlock*, 46,243 (La. App. 2 Cir. 5/18/11), 69 So.

3d 516, *writ denied*, 11-1272 (La. 9/23/11), 69 So. 3d 116, another three-vehicle collision case.

(*Id.* at 6–7.) There, the plaintiff and a second motorist both ascended an overpass, "observed stalled

traffic," and applied their brakes in time to avoid a rear-end collision. (*Id.* (citing *Ebarb*, 69 So. 3d

at 518).) The defendant also applied his brakes but nevertheless struck the second motorist's

vehicle, which, in turn, struck the plaintiff's. (*Id.* at 7 (citing *Ebarb*, 69 So. 3d at 518).) The court

rejected the defendant's invocation of the "sudden emergency" doctrine, noting that both the

plaintiff and the second motorist had stopped their vehicles in time and, in doing so, had

"established the reasonable standard of care under the circumstances." (*Id.* (citing *Ebarb*, 69 So.

3d at 521–22).) The *Ebarb* court observed that the defendant did not

> offer any competent evidence, other than the self-serving statements contained in
> his affidavit, that he had his vehicle under control, closely observed the lead vehicle

or that he was following at a safe distance prior to rear-ending [the second motorist's] vehicle and forcing it into a collision with [the plaintiff's] vehicle.

(*Id.* at 8 (quoting *Ebarb*, 69 So. 3d at 522).)

Finally, Plaintiff argues that the "unavoidable or inevitable accident" doctrine only applies if the defendant "shows that he was in no way to blame for the accident." (*Id.* (quoting *Susano v. Nat'l Union Fire Ins. Co. of Pitt.*, 24-0320 (La. App. 1 Cir. 4/14/25), 409 So. Ed 1103, 1109).) According to Plaintiff, this doctrine "is rarely, if ever, applied in favor of a motorist who rear-ends another vehicle." (*Id.*) He cites *Seals v. Morris*, where the Louisiana Supreme Court held that the doctrine did not apply to a defendant who "lost control" of his vehicle upon discovering that there was a snake on his shoulder. (*Id.* at 9 (citing *Seals*, 410 So. 2d at 717).) Plaintiff contends that the instant case "involves a simple, routine . . . traffic jam on I-10." (*Id.*) If the defendant in *Seals* could not invoke the "unavoidable or inevitable accident" doctrine, surely Defendants here cannot do so. (*Id.*)

## III.  STANDARD

### A. Rule 56 Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

"A movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th

Cir. 2019) (citing *Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.") (emphasis in original)). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (citing *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, "[his] opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citations and internal quotations omitted).

Ultimately, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

### B. Rear-End Collisions

"Under Louisiana law, '[t]he duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability.'" *Audler*, 519 F.3d at 249 (quoting *Lemann*

11

*v. Essen Lane Daiquiris*, 05-1095 (La. 3/10/06), 923 So. 2d 627, 632); *see also* La. Civ. Code art. 2315. "Under this approach, [a] plaintiff must prove the following five elements": (1) duty of care, (2) breach of duty of care, (3) cause-in-fact, (4) scope of liability, and (5) damages. *Id.* (citing *Lemann*, 923 So. 2d at 633).

A motorist must "keep his vehicle under control" while "maintain[ing] a proper lookout for hazards which[,] by the use of ordinary care and observation[,] he should be able to see in time to avoid running into them." *Sinitiere v. Lavergne*, 391 So. 2d 821, 826 (La. 1980). Closely related to this duty is the requirement that a motorist "not follow another vehicle more closely than is reasonably appropriate," which entails "having due regard" for a preceding vehicle's speed, as well as "the traffic upon and the condition of the highway." La. R.S. § 32:81(A).

"[A] following motorist in a rear-end collision is presumed to have breached the standard of conduct prescribed in [La. R.S.] 32:81 and hence is presumed negligent." *Mart*, 505 So. 2d at 1123. In order to rebut this presumption, the following motorist must "prov[e] that he had his vehicle under control, closely observed the preceding vehicle, and followed at a safe distance under the circumstances." *Eastman*, 384 So. 3d at 874 (quoting *Hooper v. Lopez*, 21-1442 (La. App. 1 Cir. 6/22/22), 344 So. 3d 656, 662). "The presumption of negligence does not preclude the consideration of comparative fault." *Id.*

### I. *"Sudden Emergency" Doctrine*

In the alternative, a following motorist can rebut the presumption of negligence by showing that the "sudden emergency" doctrine applies. *Id.* (citing *Hooper*, 344 So. 3d at 662). Under this doctrine, "a following motorist will be adjudged free from fault if [he] is suddenly confronted with an unanticipated hazard created by a favored [i.e., preceding] vehicle, which could not be reasonably avoided." *Cane*, 384 So. 3d at 1010. Deciding whether the doctrine applies entails

making "factual determinations concerning whether the [defendant] was confronted with imminent peril and whether there was sufficient time to consider and weigh the circumstances in order to take action to avoid an impending danger." *Manno*, 934 So. 2d at 117. Because the unanticipated hazard "is the foundation" of the doctrine, a defendant can claim "sudden emergency" even if he was not the one "in imminent peril." *Id.*

The "sudden emergency" doctrine "does not apply to lower the standard of care required of motorists *before* [an] emergency occurs." *Dick*, 218 So. 2d at 302 (emphasis added) (citing 2 Blashfield, Automobile Law and Practice § 102.28 (3d ed. 1965)). Likewise, a defendant cannot invoke the doctrine if he "brought th[e] emergency on himself by his own wrong or . . . [did] not use due care to avoid it" (i.e., if he was negligent). *Id.*

## II. "Unavoidable or Inevitable Accident" Doctrine

In a similar vein, the "unavoidable or inevitable accident" doctrine "relieves a person of liability" if he can "show that he himself was in no way to blame" for the accident. *Seals*, 410 So. 2d at 718–19 (on rehearing) (citing *Sharp v. Kahn*, 143 So. 514, 516 (La. App. 1 Cir. 1932)). In other words, if a following motorist shows that he "exercised ordinary care as required by law and . . . nevertheless inflicted injury on another," then the accident is deemed "inevitable" and "no liability attaches." *Susano*, 409 So. 3d at 1109 (citing *Lowe v. Noble, L.L.C.*, 16-0165 (La. App. 1 Cir. 5/9/17), 220 So. 3d 761, 766).

"Unavoidable or inevitable accident" is not an affirmative defense, but rather "negatives negligence." *Seals*, 410 So. 2d at 719 (on rehearing) (quoting 2 Blashfield, Automobile Law and Practice § 101.13 (rev. 3d ed. 1979)). "The mere fact that . . . a collision might have been inevitable or unavoidable at the time of its occurrence will not entitle [a following] motorist to the protection

of the doctrine . . . if the situation thus brought about was the result of [his] own negligence." *Id.* (quoting Automobile Law and Practice § 101.13, *supra*).

## IV. DISCUSSION

Preliminarily, the Court notes that the parties' briefs cite only the depositions of Smith, Hughes, and Angela Hughes. *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16, 915 n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992))). The testimony of these individuals is consistent, at least as far as the facts material to this motion. (*See generally* Doc. 19-6; Doc. 21-2; Doc. 21-3; Doc. 22-2.)

The collision took place between 10:00 and 11:00 a.m. on April 7, 2023. (Doc. 19-6 at 3; Doc. 21-2 at 19.) It had rained earlier that morning and was, perhaps, still misting. (Doc. 21-2 at 24; Doc. 21-3 at 12–13.) Consequently, the roadway was wet. (Doc. 21-2 at 24; Doc. 21-3 at 12–13.) Smith and Hughes were traveling on I-10 westbound, in the left lane. (Doc. 19-6 at 4–5.) Smith was driving a Dodge Ram 3500 and towing a Gooseneck 40' trailer with Monster ramps. (Doc. 19-6 at 3–4.) Hughes was driving a Winnebago Solis. (*See* Doc. 21-2 at 16.) Angela Hughes was riding shotgun. (Doc. 21-3 at 19.)

Traffic on I-10 between Baton Rouge and Lafayette was "modest"—"[t]he average traffic pattern you would expect on the freeways." (Doc. 21-2 at 20.) Hughes's cellphone was mounted "in front of the windshield." (*Id.* at 21–22.) Before driving, Hughes had activated the device's GPS because he wanted to be alerted to any "traffic or detours." (*Id.* at 21.)

Smith and Hughes encountered an overpass before the Atchafalaya Basin Bridge. (Doc. 21-2 at 25–26; Doc. 22-2 at 4.) By that point, Hughes had been following Smith for 25 miles—

14

roughly 20–30 minutes. (Doc. 21-2 at 23–24.) Hughes left 10–20 car lengths between his vehicle and Smith's. (Doc. 21-2 at 27.)[2] He maintained a speed of 40–50 miles per hour. (Doc. 21-2 at 27.) Smith crested the overpass first. (Doc. 21-2 27–28.) As Hughes was ascending the overpass, he was unable to see Smith's vehicle. (Doc. 21-2 at 27–28; *see also* Doc. 21-3 at 10–11.)

When Hughes crested the overpass, he saw that traffic was stopped, "slammed on [his] brakes," lost traction, and skidded into Smith's flatbed trailer. (Doc. 21-2 at 26, 28–29; *see also* Doc. 21-3 at 11–12.) Hughes's brakes had been inspected recently and were in working order. (Doc. 21-2 at 29.) It is possible that the van hydroplaned. (Doc. 21-3 at 22.) Regardless, Hughes did not try to swerve to avoid the collision. (Doc. 21-2 at 29.) Hughes was still on the decline when the crash occurred. (Doc. 21-3 at 22–23.) Smith was "just past" the decline. (Doc. 22-2 at 5–6; *see also* Doc. 21-3 at 22.)

Angela Hughes reported nothing "out of the ordinary [with] the way [Smith] was operating his truck and trailer" before the crash. (Doc. 21-3 at 11.) Hughes knew that Smith's vehicle was stopped because the taillights were illuminated. (Doc. 21-2 at 31–32; *see also* Doc. 21-3 at 11.) According to Hughes, Smith did nothing to cause or contribute to the crash. (Doc. 21-2 at 28.) Prior to the collision, Smith did not see or hear anything that "would have alerted [him] to the impending impact." (Doc. 22-2 at 6.) After impact, Smith's vehicle did not strike any others. (Doc. 21-2 at 32.)

During his deposition, Hughes acknowledged that a driver must follow at a safe distance and otherwise exercise caution, especially during inclement weather. (Doc. 21-2 at 35, 37–38.)

---

[2] Later in his deposition, Hughes revised this estimate down to 10–12 car lengths, or 80–90 feet. (Doc. 21-2 at 38, 50.) The Court notes that 80–90 feet is far less than 10–12 car lengths. *See, e.g.*, *United States v. Ramos*, No. 16-38, 2016 WL 4191905, at *3 n.3 (N.D. Tex. Aug. 9, 2016) ("[A] car length is approximately 20 feet. . . ."). But in either case—car lengths or feet—Hughes's later estimate weakens Defendants' position. Given the posture and the parties' briefs, however, the Court accepts Hughes's initial estimate of 10–20 car lengths. (*See* Doc. 21-2 at 27.)

Likewise, he agreed that a driver must always be alert and must anticipate that traffic will "slow down or stop without warning." (Doc. 21-2 at 35–36.)

### A. "Sudden Emergency" Doctrine

Defendants cite ample caselaw regarding comparative fault, (*see* Doc. 21 at 4–6), culminating in the argument that a "favored motorist can be found comparatively negligent if his substandard conduct contributed to the cause of the accident," (*id.* at 4 (citing *Watson*, 172 So. 3d at 665)). Conspicuously, though, Defendants nowhere suggest that Smith was comparatively negligent. (*See id.*) Nor do Defendants blame a third party for contributing to or causing the collision. (*See id.*)

Instead, Defendants seek to invoke the "sudden emergency" doctrine, as well as the "unavoidable or inevitable accident" doctrine. (*Id.* at 6–9.) Given the undisputed facts, the Court finds that the "sudden emergency" doctrine does not apply here. Simply, Defendants have not shown that there was an "unanticipated hazard." *Cane*, 384 So. 3d at 1010. They point only to the standstill "on the blindside of the interstate overpass." (*Id.* at 8–9.) But faced with similar circumstances, Louisiana courts have rejected claims of "sudden emergency." *See, e.g.*, *Ebarb*, 69 So. 3d at 522.

In *Ebarb*, for example, Louisiana's Second Circuit Court of Appeal affirmed summary judgment in the plaintiff's favor. *Id.* at 518, 522. In that case, the plaintiff and a second motorist were ascending an overpass at 55–60 miles per hour, when they noticed that traffic ahead had stalled. *Id.* at 518, 521–22. Both drivers "were able to bring their vehicles safely to a stop at a comfortable distance behind the preceding vehicles." *Id.* at 521–22 (internal citations omitted). Although the defendant was driving at roughly the same speed as the plaintiff and the second motorist, he failed to stop in time and therefore caused a collision. *Id.* at 518.

16

In opposition to the plaintiff's motion for summary judgment, the defendant invoked the "sudden emergency" doctrine, arguing that, "because the overpass was elevated and he was unable to see over the other side of the crest where the traffic was stalled in the eastbound lanes, there was nothing more he could have done to avoid impact." *Id.* at 519. The court disagreed, noting that "the law charges the [following] driver with having seen what he should have seen and [that] subsequent events are judged [accordingly]." *Id.* at 521. The court held that "[t]he fact that [a preceding] driver is able to see and avoid an emergency situation ahead sets the standard of care applicable to . . . following drivers." *Id.* Because the plaintiff and the second motorist had both seen the traffic and stopped their vehicles in time, the defendant could not claim that the circumstances gave rise to a sudden emergency. *Id.* at 522. And his mere insistence "that he had his vehicle under control, closely observed the lead vehicle or that he was following at a safe distance" was insufficient to rebut the presumption of negligence. *Id.* at 522.

Compare *Ebarb* with *King v. State Farm Insurance Co.*, 47,368 (La. App. 2 Cir. 8/8/12), 104 So. 3d 33. In the latter case, the plaintiff was roughly 2–3 car lengths behind the defendant and was driving five miles below the speed limit. *Id.* at 39. She lost sight of the defendant's vehicle when it went over a hill. *Id.* As the plaintiff crested the hill, she regained sight of the defendant, at which time she saw him collide with the preceding vehicle. *Id.* In reaction, the plaintiff steered onto the shoulder of the road, but the defendant's vehicle spun into the shoulder at roughly the same time. *Id.* The plaintiff's vehicle therefore crashed into the defendant's. *Id.* At trial, the plaintiff claimed that she was responding to a sudden emergency—namely, the first collision, which was caused by the defendant. *Id.* The court agreed. *Id.* at 39–40.

The instant case is much closer to *Ebarb* than to *King*. Defendants do not argue that Smith was driving erratically or otherwise created a sudden emergency (e.g., by colliding with the vehicle

in front of his). (*See* Doc. 21.) Indeed, the depositions show just the opposite: Angela Hughes testified that Smith was driving normally. (Doc. 21-3 at 11.) Both Angela Hughes and her husband knew that Smith's vehicle was stopped because its taillights were illuminated. (Doc. 21-2 at 31–32; *see also* Doc. 21-3 at 11.) Hughes was unequivocal that Smith did nothing to cause or contribute to the crash. (Doc. 21-2 at 28.) And after impact, Smith did not strike the preceding vehicle, indicating that he was attentive and that he maintained control of his vehicle. (*Id.* at 32.)

Like the defendant in *Ebarb*, Defendants here contend that the sudden emergency was obscured traffic. (Doc. 21 at 8–9); *see Ebarb*, 69 So. 3d at 519. However, as the preceding motorist, Smith established the standard of care. *See Ebarb*, 69 So. 3d at 521–22; *accord Anderson v. May*, 01-1031 (La. App. 5 Cir. 2/13/02), 812 So. 2d 81, 86 (citing *Potts v. Hollier*, 344 So. 2d 70, 71–72 (La. App. 4 Cir. 1977)) ("The fact that the second driver is able to see and avoid an emergency situation ahead sets the standard of care applicable to other following drivers."). The fact that Smith crested the overpass, saw that traffic was slowing down or had stopped, and braked in time to avoid a collision signals that Hughes could—should—have done the same. *See Ebarb*, 69 So. 3d at 522. The traffic on the "blindside" of the overpass, (Doc. 21 at 8), therefore does not qualify, as a "sudden emergency" under these circumstances, *see Ebarb*, 69 So. 2d at 521–22; *see also* Daigle, 2016 WL 687157, at *7 ("Rear-end collisions are common occurrences on the roadways of this state, and an abruptly stopped vehicle is not an unanticipated occurrence . . . ."); *Fontenot v. Boehm*, 512 So. 2d 1192, 1194 (La. App. 4 Cir. 1987) (emphasizing that a hazard must be unanticipated and implying that highway traffic does not qualify).

### B. "Unavoidable or Inevitable Accident" Doctrine

Defendants also invoke the "unavoidable or inevitable accident" doctrine. (Doc. 21 at 9.) Again, this doctrine only applies where a defendant can "show that he himself was in no way to

blame" for the accident. *Seals*, 410 So. 2d at 718–19 (on rehearing) (citing *Sharp*, 143 So. at 516). This is a rather high bar. *Id.* at 719 (faulting the defendant for creating the conditions in which a snake could get into his vehicle and for overreacting upon discovering that the snake was on his shoulder). Defendants have not cleared it.

Defendants contend that the rear-end collision here was unavoidable because (1) the roadway conditions were poor and/or (2) Hughes could not see that traffic had stopped on the other side of the overpass. (Doc. 21 at 9.) These arguments are unavailing. First, the Court accepts that the roadway was wet and that, despite braking, Hughes lost traction on the decline, causing his vehicle to skid into Smith's. (*See, e.g.*, Doc. 21-2 at 26, 28–29.) But with some frequency, Louisiana courts have found that the "unavoidable or inevitable accident" doctrine does not apply to such situations. *See, e.g.*, *Richardson v. Aldridge*, 37,192 (La. App. 2 Cir. 5/16/03), 854 So. 2d 923, 937 (on rehearing) (concluding that the "unavoidable or inevitable accident" doctrine was inapplicable where a motorist had hydroplaned while driving between 40 and 60 miles per hour).

In *Tolbert v. Fireman's Fund Insurance Co.*, Louisiana's Third Circuit Court of Appeal affirmed partial summary judgment in the plaintiffs' favor, refusing to apply the "unavoidable or inevitable accident" doctrine where the defendant motorist was driving under the speed limit but nevertheless hydroplaned. *Tolbert*, 98-637 (La. App. 3 Cir. 10/7/98), 719 So. 2d 738, 740–42. Although the defendant argued "that he could have hydroplaned through no fault of his own," the court thought that the mere "assertion of an [extrinsic] cause of the accident [e.g., the inclement weather] [wa]s not sufficient absent supportive proof which would overshadow [the defendant's] actions [i.e., driving at 52 miles per hour]." *Id.* at 742.

Second, the Court accepts that, during his ascent, Hughes could not see that traffic had stopped on the other side of the overpass. (*See* Doc. 21 at 9.) But this fact does not "show that he

. . . was in no way to blame" for the accident. *See Seals*, 410 So. 2d at 718–19 (on rehearing) (citing *Sharp*, 143 So. at 516). "Even though a motorist may assume that the road ahead is safe for travel, he must, when traveling . . . in circumstances of impaired visibility, observe and so control his vehicle as to avoid discernible objects in the path of travel . . . ." *Davis*, 796 So. 2d at 769; *accord Jackson v. Scott Truck & Tractor, Inc.*, 31,933 (La. App. 2 Cir. 5/5/99), 736 So. 2d 987, 992.

Like all motorists, Hughes was "under a never ceasing duty to maintain a proper lookout and to see what should be seen." *Jackson*, 736 So.2d at 992. Although he knew that he could not see the other side of the overpass—and although he knew that the roadway was wet, that it took his van longer to come to a stop, and that he needed to anticipate that traffic might "slow down or stop without warning"—he nevertheless continued driving at 40–50 miles per hour during the ascent. (Doc. 21-2 at 26–28, 35–38; Doc. 21-3 at 23); *see also Richardson*, 854 So. 2d at 937 ("Adverse driving conditions call for unusual caution on the part of motorists.").

Even drawing all reasonable inferences in Defendants' favor, the court finds that neither the "sudden emergency" nor "unavoidable or inevitable accident" doctrine applies.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiff's *Motion for Partial Summary Judgment on the Issue of Fault* (Doc. 19) is **GRANTED**. The Court finds that Defendant Wilbur Hughes is at fault in the accident of April 7, 2023.

Signed in Baton Rouge, Louisiana, on <u>November 17, 2025</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**